UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF NEW YORK

--------------------------------------------------------------- X

**TAISHAWN BLANTON**,

                             Plaintiff,

                – against –

**NASSAU COUNTY SHERIFF DEPARTMENT**,

                            Defendant.

--------------------------------------------------------------- X

**MEMORANDUM DECISION AND ORDER**

20-CV-768 (AMD) (LGD)

**ANN M. DONNELLY**, United States District Judge:

On February 11, 2021, the *pro se* plaintiff filed this Section 1983 action against the Nassau County Sheriff's Department ("NCSD").[1]  (ECF No. 1.)  He claims that the conditions of his confinement at the Nassau County Correctional Center ("NCCC")—mold in the shower and on the ceiling, no air ventilation, officers "slam[ming] the gates" while he slept, and noncompliance with COVID-19 protocols—violated his constitutional rights.  (*Id.* at 4.)  Before the Court is the defendant's motion for summary judgment.  (ECF No. 66.)  The motion is granted, as explained below.

---

[1] The caption names the defendant as the "Nassau County Sheriff Department;" the defendant refers to itself with the name "Nassau County Sheriff's Department."  (*See, e.g.*, ECF No. 70 at 1.)

# BACKGROUND[2]

## I.    Medical Services at NCCC

At all times relevant to the plaintiff's claims, the Nassau Health Care Corporation

("NHCC")[3] provided medical and mental health services to the incarcerated population at the

NCCC's Medical Infirmary Unit.  (Defendant's Rule 56.1 Statement ¶ 24, ECF No. 70.)  An

inmate seeking medical services submitted a "Sick Call form."  (*Id.*)  NHCC staff either

examined the inmate the same day or the next day, or addressed the request on the Sick Call

form.  (*Id.*)  NHCC staff decided whether to enroll an inmate in the "Chronic Care Clinic," which

provided a "higher level of care" to those whose conditions required it; NHCC staff also

determined the frequency of an inmate's attendance at the Clinic.  (*Id.* ¶ 25.)  The NCCC placed

inmates determined by NHCC "to be at a higher rate of serious illness from COVID-19" in a

---

[2] The facts are drawn from the complaint and the defendant's Rule 56.1 statement, declarations, and exhibits.  The Court interprets all facts in the light most favorable to the plaintiff, as the non-moving party.  *See Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 545 (2d Cir. 2010); *Salamon v. Our Lady of Victory Hosp.*, 514 F.3d 217, 226 (2d Cir. 2008).  Moreover, the Court reads the *pro se* plaintiff's pleadings "liberally" and "interprets them 'to raise the strongest arguments that they suggest.'" *McPherson v. Coombe*, 174 F.3d 276, 280 (2d Cir. 1999) (quoting *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994)).

The plaintiff did not submit any evidence or a Rule 56.1 statement, though the defendant served the plaintiff with a notice of the nature and consequences of summary judgment.  That notice advised the plaintiff that he must "submit evidence, such as witness statements or documents, countering the facts asserted by the defendant . . . and raising specific facts that support [his] claim."  (ECF No. 72; *see also* ECF No. 74 (Certificate of Service)).  *See Gilani v. Teneo, Inc.*, No. 22-169, 2022 U.S. App. LEXIS 35094, at *6 (2d Cir. Dec. 20, 2022).  However, the plaintiff filed an opposition, in which he stated that the NCCC was "filthy" and "bad for people mentally and physically," and that "Nassau County . . . would portray [itself as] doing [its] job correctly" but it "do[es] not care for anyone."  (ECF No. 78 at 2, 4.)  He also maintained that evidence of some of his "medical issues [were] not placed in [his] records" and that the defendant did not include photographs of the "sleeping and shower areas."  (*Id.* at 2.)

[3] The NHCC is a New York state public benefit corporation; it is not an administrative arm of or operated by Nassau County or the NCSD.  (ECF No. 70 ¶ 9 (citing N.Y. Pub. Auth. Law §§ 3400–3420).)  During the relevant time period, NHCC employees "provided medical services, including mental health services, to all incarcerated individuals in custody at the NCCC" (ECF No. 70 ¶ 7; *see* ECF No. 71 ¶¶ 3, 20); NCSD employees were responsible only for "transporting" NCCC inmates to NHCC employees for treatment and for "providing security" to NHCC employees (ECF No. 70 ¶ 9).

"special housing unit," which had a fully staffed nursing station, multiple areas for quarantining, and direct access to the Medical Unit.  (*Id.* ¶ 28.)

## II.     COVID-19 Protocols at the NCCC[4]

Beginning on about March 26, 2020, NCCC staff offered newly admitted inmates COVID-19 tests during the initial intake processing and evaluated them for any other medical issues.  (ECF No. 70 ¶ 11.)  The new inmates spent a period of time in the "New Admission Housing Unit" so that the current NCCC population would not be exposed to COVID-19.  (*Id.* ¶ 12.)  NHCC staff closely monitored the new admissions and cleared them for transfer to the general population if they determined that the new inmates did not have COVID-19 symptoms. (*Id.* ¶¶ 12–13; *see also id.* ¶¶ 14–15 (describing the "incubation" and "rotation" processes to ensure new admissions did not infect each other or the general population with COVID-19).)

The NCCC tested inmates with COVID-19 symptoms and quarantined them in the Medical Infirmary, a separate housing unit, while their COVID tests were processed.  (*Id.* ¶ 16.) If a test was positive, NCCC staff moved the person to a separate quarantine housing unit until NHCC staff cleared the person to leave.  NHCC staff checked the quarantined inmates' vital signs and mental health every day.  (*Id.* ¶¶ 16–17.)  NHCC moved inmates with positive COVID-19 tests but no symptoms from the quarantine housing unit to a "step down" unit, where NHCC staff observed them until they were cleared to return to the general population.  (*Id.* ¶ 19.) A quarantined inmate's general population housing unit also quarantined "for a period of time determined by NHCC medical staff," who took their temperature and oxygen levels regularly

---

[4] NCSD displayed "[i]nformational posters and signs" about the COVID-19 pandemic, policy updates, and suggested medical precautions throughout the facility, distributed written memoranda by email or on paper, and posted memoranda and notifications on bulletin boards and in public areas in each NCCC housing unit.  NCSD also read updates to staff at "numerous consecutive line-ups."  (ECF No. 70 ¶¶ 10, 22, 23.)

throughout the quarantine period.  (*Id.* ¶ 20.)  NCSD maintenance staff, as well as "specially trained staff from the Department's Fire Safety Unit," "clean[ed], sanitize[d], and disinfect[ed] the cell" of an infected person before placing another person in the cell.  (*Id.* ¶ 39.)

NCSD enforced social distancing throughout the COVID-19 pandemic by limiting outdoor recreation to groups of five to 10 inmates at a time, placing placards on the floors in the housing unit common areas, visitor's area, and admission and intake areas, and reminding inmates and staff multiple times to follow social distancing guidelines.  (*Id.* ¶¶ 51–53.) Beginning on March 26, 2020, NCSD "cancelled all inmate visits, outside programs and outside services" and reduced its staff at the NCCC to "essential personnel only" to prevent COVID-19 exposure.  (*Id.* ¶ 54.)  NCSD resumed visitation starting on July 1, 2020, but cancelled it on November 16, 2020, after a resurgence of COVID-19 cases.  (*Id.* ¶¶ 55–56.)  Throughout the relevant time period, NCSD gave inmates "free minutes of phone time each week" and set up phone stations for them to communicate with their attorneys.  (*Id.* ¶ 57.)

Beginning on March 25, 2020 and throughout the rest of the relevant time period, NCSD staff had access to free COVID-19 testing, including antibody testing after May 4, 2020.  (*Id.* ¶¶ 30–31, 35.)  Then-Sheriff James Dzurenda distributed educational materials to NCSD employees on the proper use of personal protective equipment, sanitation and hygiene.  (*Id.* ¶ 32.)  Starting on March 27, 2020, NCSD assigned staff to take the temperatures of all employees entering the NCCC and screen them for COVID-19 symptoms.  (*Id.* ¶ 33; ECF No. 66-10 at 9.)  NCSD advised any staff members who felt sick or had COVID-19 symptoms to stay home or leave early and isolate at home until their symptoms went away.[5]  (*Id.* ¶ 34.)

---

[5] "Quarantine [time] periods constantly fluctuated as a result of guidance [that NCSD] received from governmental and authoritative agencies" including the Center for Disease Control, the New York State Department of Health, and the NHCC.  (*Id.* ¶ 34.)

On about March 11, 2020, NCSD provided staff with N-95 masks, instructed them on their proper use, and told them to keep the masks with them at all times.  (*Id.* ¶ 58.)  Beginning on April 15, 2020, NCSD required staff to wear a "face and nose covering" whenever they were "in direct contact with members of the public, other staff members, and inmates;" beginning on November 25, 2020, staff had to "wear a mask while on duty when in the presence of another individual, either staff or inmate, even if social distancing was possible."  (*Id.* ¶ 59.)  Staff also received latex gloves to wear while they were on duty.  (*Id.*)  "Throughout the pendency of the COVID-19 pandemic, no member of [NCSD] was ever disciplined or reprimanded for failure to wear masks in accordance with [NCSD's] requirement."  (*Id.*; *see* ECF No. 73 ¶ 34.)

NCSD placed hand sanitizer units at all entrances and exits of NCCC buildings for use by staff and visitors.  (ECF No. 70 ¶ 47.)[6]  Starting in late April 2020, NCSD provided all inmates with at least two face masks, and more upon request.  (*Id.* ¶ 60.)[7]  All inmates and staff were required to wear a face mask in the Medical Unit, and anyone going to the Medical Unit for treatment had to wear a mask during transportation to the unit.  (*Id.* ¶ 61.)  NCSD never ran out of face masks for its staff or NCCC inmates.  (*Id.* ¶ 62.)

On November 10, 2020, the New York State Commission of Correction ("NYSCOC") inspected the NCCC for compliance with state COVID-19 protocol.  (*Id.* ¶ 63.)  NYSCOC found that the NCCC's protocols—including "the screening of employees, incarcerated individuals, visitors to the facility, signage throughout the facility, the disinfecting procedures and the utilization of face coverings"—"appear consistent with the guidance provided by the

---

[6] Inmates did not receive hand sanitizer because of the security concerns about alcohol-based solutions.  (*Id.* ¶ 45.)

[7] Inmates could exchange their face masks for new masks once a month.  (*Id.* ¶ 60.)

[NYSCOC], the New York State Department of Health, and the Center for Disease Control." (*Id.* ¶ 64.)

The COVID-19 vaccine was available to NCSD staff beginning on January 15, 2021. (*Id.* ¶ 36.)

### III.   Cleaning Protocols at the NCCC

"Before and during the COVID-19 pandemic," work crews of NCCC inmates "clean[ed] and sanitiz[ed] the NCCC housing units several times a day," overseen by NCSD staff.  (*Id.* ¶ 41.)  Inmates "were responsible for cleaning their own housing cell" every day (*id.* ¶ 44) and were given soap and other cleaning supplies "[e]very Saturday" to do so; NCSD staff provided cleaning supplies throughout the week upon request (*id.*).  Each cell had a sink, and each person received his own bar of soap; inmates were "continuously reminded of the importance of personal hygiene including washing and cleaning their hands."  (*Id.* ¶¶ 43, 46.)  NCSD also provided "sanitizing solution and towels near the phones in each NCCC housing unit so that people could sanitize the phones (or other surfaces) . . . themselves."  (*Id.* ¶ 41.)

From approximately March 1, 2020 through April 23, 2023, two maintenance facility work crews trained on COVID-19 cleaning guidelines "cleaned and sanitized the NCCC facility," including the Inmate Housing areas, work areas, vehicles, restraints, visitor center, inmate cells, and shower areas "throughout every day and evening."  (*Id.* ¶¶ 37–38.)  The NCSD maintenance staff—not the inmate work crews—cleaned the cells of individuals who tested positive for COVID-19.  (*Id.* ¶ 42.)

6

Before and during the COVID-19 pandemic, the NCCC used CDC-recommended air filters and complied with CDC guidelines on circulating "outside air" into the facility.  (*Id.* ¶ 48.) All air filters at the NCCC were changed every three months.  (*Id.* ¶ 49.)[8]

## IV.   NCCC's Inmate Grievance Program

Everyone incarcerated at the NCCC receives an Inmate Handbook, which explains the grievance procedure that inmates must follow to submit complaints about the conditions of their confinement at the NCCC; the handbook describes the applicable timeframes, how to get a grievance form, where to file the form, and what information is necessary to fill out the form properly.  (*Id.* ¶¶ 100–01, 103; *see* ECF No. 66-13.)

According to the handbook, the inmate must file a grievance within five days "of the date of the act or occurrence leading to the grievance."  (*Id.* ¶ 104.)  Within five business days of receiving a grievance, the Grievance Coordinator will issue a written finding.  (*Id.*)  Within two days of receiving the written finding, the inmate may "appeal a negative finding to the Chief Administrative Officer," who will issue a written determination on the appeal within five business days of receipt of the appeal.  (*Id.*)  The inmate may appeal the Chief Administrative Officer's denial, within three business days after receiving it, to the New York State Commission of Correction by "indicating [the] desire to appeal on the Inmate Grievance Form."  (*Id.*)  Within three business days of receiving the notice of appeal, the Grievance Coordinator mails the appeal, "the accompanying investigation report and all other pertinent documentation to the Commission's Citizens Policy and complaint Review Council," which will issue a written determination on the appeal within 45 business days of receipt.  (*Id.*)

---

[8] "All air filters in the NCCC are in areas where incarcerated individuals are not permitted to go," so inmates are "unable to see when the Maintenance Department staff change[s]" the filters.  (*Id.* ¶ 49.)

V.     **Plaintiff's Allegations**

The plaintiff was incarcerated at the NCCC in East Meadow, New York from August 13, 2019 to August 14, 2020, and from August 21, 2020 to August 2, 2021.  (*Id.* ¶ 3.)[9]  He alleges that his health and life were "in [d]anger because of the way we live" at the NCCC.  (ECF No. 1 at 4.)  While he was at the NCCC, every dorm had mold "all over the ceiling" and in the shower, and there was no ventilation.  (*Id.*)

Throughout the COVID-19 pandemic, officers "walk[ed] around with no mask or gloves on." (*Id.*)  The plaintiff tested positive for COVID-19 on January 29, 2021, and was quarantined in a separate housing unit until February 11, 2021.  (ECF No. 70 ¶¶ 81–82.)[10]  He was moved to a "quarantine dorm," but the nurses "clear[ed] people to go back around other inmates" without testing them first.  (ECF No. 1 at 4.)  The officers did not wear masks or gloves when the plaintiff had the virus (*id.*), except when the sergeant or "higher ups" were working (ECF No. 66-4 at 31:6-8).

The plaintiff's asthma "ha[d] been affecting [him] more" since he arrived at the NCCC. (ECF No. 66-4 at 10:21–11:4.)  The mold affected his health as time went by, but did not affect him "that much," and he did not have much difficulty breathing at the NCCC.  (*Id.* at 35:16-20.)  He also had "mental health problems;" he "talk[ed] to himself," was "seeing things," and "having anxiety from being locked in all day every day."  (ECF No. 1 at 4.)  He also alleges that officers "slam[med] the gates" while he slept.  (*Id.*; *see* ECF No. 66-4 at 20–21.)

---

[9] The record suggests that the plaintiff was incarcerated at the NCCC both before his criminal trial and after he pled guilty.  He filed this action during his incarceration there, on February 11, 2021.  (ECF No. 66-4 at 23–24.)  He was transferred to Franklin Correctional Facility on August 2, 2021, and was still there as of July 11, 2023, when the defendant filed its summary judgment motion.  (ECF No. 66-9.)

[10] The plaintiff alleges in the complaint that he tested positive for COVID-19 on February 2, 2021, but according to the record, his test results were from January 29, 2021.  (ECF No. 66-19.)  He filed this action on February 11, 2021.

## VI.    Plaintiff's Medical History

The plaintiff has had mild asthma since he was a child.  (ECF No. 70 ¶¶ 70–71.)  He treated the condition with asthma pumps both before and during his incarceration at the NCCC, and he was allowed to keep his pumps with him at the NCCC.  (*Id.* ¶¶ 70, 74.)  He visited the Chronic Care Clinic five times for his asthma.  (*Id.* ¶ 73; *see also* ECF No. 66-14.)  He made 154 sick call requests during his time at NCCC (ECF No. 66-15), occasionally because he was having difficulty breathing (*see id.* at 48, 109).  The NHCC staff gave him medical care after each request.  (*Id.*; ECF No. 70 ¶ 74.)[11]

On January 29, 2021, the plaintiff told NCCC officers that he "was not feeling good" (ECF No. 66-4 at 31:25–32:4); he tested positive for COVID-19 and moved to a separate quarantine housing unit the same day (*id.* at 32:3-6; ECF No. 70 ¶¶ 80–81).  The plaintiff stayed in the quarantine housing unit, in his own cell, from January 29, 2021 until February 11, 2021 (*id.* ¶¶ 82–83), during which time NHCC staff "observed [the] plaintiff, offered [him] vitamins (which [he] refused)," gave him his inhaler twice a day, and checked his temperature every morning (*id.* ¶ 84, ECF No. 66-4 at 32:24–33:4).  NHCC mental health staff also checked on the plaintiff every day in the quarantine unit.  (ECF No. 70 ¶ 85.)

The plaintiff lost his sense of smell and taste for two days when he had COVID-19.  He also had a cough, and felt weak, but these symptoms did not affect his asthma.  (*Id.* ¶¶ 86–87; *see also* ECF No. 66-4 at 27:11-20, 28:21-25, 32:17-23.)  On February 11, 2021, NHCC staff cleared the plaintiff to return to the general inmate population (ECF No. 70 ¶ 88), and on April 27, 2021,

---

[11] The plaintiff injured his back before he was incarcerated at the NCCC, which made it difficult for him to sleep.  (*Id.* ¶ 97; *see also, e.g.*, ECF No. 66-15 at 15, 41, 148, 152, 154.)

the plaintiff got a COVID-19 vaccine (*id.* ¶ 99).  He did not experience any lasting health effects after his release from the NCCC.  (*Id.* ¶ 94; *see also* ECF No. 66-4 at 33:5-8).

The plaintiff felt anxious at the NCCC; at times, he "talk[ed] to himself" and was "seeing things."  (ECF No. 70 ¶ 68 (citing ECF No. 1 at 4); *see also* ECF No. 66-14 at 140.)  He was anxious about what was happening in his criminal case, and because he was previously incarcerated.  (ECF No. 70 ¶ 96; ECF No. 66-4 at 33:22–34:12.)

## VII.    Plaintiff's Grievances

The plaintiff filed 16 grievances during his nearly two years at the NCCC, in which he:

- requested to receive free goods (Oct. 28, 2019) (ECF No. 66-18 at 1–5);

- requested an x-ray of his right ankle (June 16, 2020) (*id.* at 6–11);

- requested not to be identified as a gang member (July 11, 2020) (*id.* at 12–18);

- requested additional food (Aug. 2, 2020) (*id.* at 19–22);

- requested Ensure as a dietary supplement (Aug. 6, 2020) (*id.* at 23–42);

- claimed that the sink in his cell did not have hot water (Sept. 20, 2020) (*id.* at 43–46);

- claimed that the housing unit television was missing buttons (Sept. 20, 2020) (*id.* at 47–50);

- requested hydrocortisone cream for his eczema (Oct. 9, 2020) (*id.* at 51–56);

- requested two shirts that he received in the mail (Nov. 8, 2020) (*id.* at 57–63);

- claimed that the NCCC's food made him sick, and requested only fish and red meat (Dec. 7, 2020) (*id.* at 64–76);

- claimed that the housing unit television was broken (Dec. 14, 2020) (*id.* at 77–82);

- requested that the heat be turned on (Jan. 1, 2021) (*id.* at 83–86);

- claimed that he was not supposed to get bologna or turkey (Mar. 23, 2021) (*id.* at 87–95);

- requested a chicken and beef diet (Apr. 5, 2021) (*id.* at 96–104);

- claimed that he was allergic to certain foods (Apr. 13, 2021) (*id.* at 105–20); and

- claimed that he had not received books that had been mailed to him (June 21, 2021) (*id.* at 121–30).

The plaintiff did not file any grievances about the COVID-19 pandemic or the NCCC's response to the pandemic, staff's noncompliance with COVID-19 policy, mold in the dorms, showers, or housing units, air ventilation, his asthma, or gates slamming while he was sleeping. (*See* ECF No. 66-4 at 16:12-19, 20:23-25; ECF No. 66-18; ECF No. 68 ¶ 10.)

## LEGAL STANDARD

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The Court does not resolve factual disputes; rather, the Court determines whether there are any disputed issues of material fact. *Donahue v. Windsor Locks Board of Fire Comm'rs*, 834 F.2d 54, 58 (2d Cir. 1987). "A fact is material when it might affect the outcome of the suit under governing law." *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 202 (2d Cir. 2007). A dispute about a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986) (summary judgment is proper only when "there can be but one reasonable conclusion as to the verdict"). "[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a

genuine issue of material fact." *Celotex Corp.*, 477 U.S. at 323.  If the movant satisfies that burden, the burden shifts to the non-movant to proffer evidence demonstrating that a dispute exists.  *Weg v. Macchiarola*, 995 F.2d 15, 18 (2d Cir. 1993).  "[T]he non-moving party may not rely simply on conclusory allegations or speculation to avoid summary judgment, but instead must offer evidence to show that [her] version of the events is not wholly fanciful."  *Morris v. Lindau*, 196 F.3d 102, 109 (2d Cir. 1999) (cleaned up).

A court determining whether summary judgment is appropriate draws "all justifiable inferences" in the non-movant's favor.  *Anderson*, 477 U.S. at 255.  If "there is any evidence in the record from any source from which a reasonable inference could be drawn in favor of the nonmoving party, summary judgment is improper."  *Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 37 (2d Cir. 1994).  Courts should not grant summary judgment even if the evidence is undisputed if different jurors could reasonably interpret the evidence in opposing ways.  *See Schoolcraft v. City of New York*, 103 F. Supp. 3d 465, 506 (S.D.N.Y. 2015).

"When a *pro se* litigant is involved, although the same standards for summary judgment apply, the *pro se* litigant should be given special latitude in responding to a summary judgment motion."  *Laster v. Mancini*, No. 07-CV-8265, 2013 U.S. Dist. LEXIS 138599, at *5 (S.D.N.Y. Sep. 25, 2013) (citations omitted).  Accordingly, courts hold *pro se* submissions to "less stringent standards than formal pleadings drafted by lawyers," *Hughes v. Rowe*, 449 U.S. 5, 9 (1980) (quoting *Haines v. Kerner*, 404 U.S. 519, 520 (1972)), by "read[ing] the pleadings of a *pro se* plaintiff liberally and interpret[ing] them 'to raise the strongest arguments that they suggest,'" *McPherson v. Coombe*, 174 F.3d 276, 280 (2d Cir. 1999) (quoting *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994)).  *See also Bertin v. United States*, 478 F.3d 489, 491 (2d Cir. 2007).  Nevertheless, *pro se* status "does not exempt a party from compliance with relevant rules of

procedural and substantive law" or "vitiate the requirement that triable issues of fact must be raised in order to defeat a summary judgment motion." *Edwards v. Destafano*, No. 13-CV-4345, 2023 U.S. Dist. LEXIS 184090, at *9 (E.D.N.Y. July 14, 2023) (quoting *Traguth v. Zuck*, 710 F.2d 90, 95 (2d Cir. 1983)), *report and recommendation adopted*, 2023 U.S. Dist. LEXIS 174419 (E.D.N.Y. Sept. 28, 2023).

## DISCUSSION

The defendant makes multiple arguments for summary judgment (ECF No. 71), none of which the plaintiff addresses in his opposition (ECF No. 78). "Federal courts may deem a claim abandoned when a party moves for summary judgment on one ground and the party opposing summary judgment fails to address the argument in any way." *Maher v. All. Mortg. Banking Corp.*, 650 F. Supp. 2d 249, 267 (E.D.N.Y. 2009) (quoting *Taylor v. City of New York*, 269 F. Supp. 2d 68, 75 (E.D.N.Y. 2003)) (collecting cases). In light of the plaintiff's *pro se* status, the Court analyzes the defendant's arguments on the merits. *See, e.g.*, *Feuer v. Cornerstone Hotels Corp.*, No. 14-CV-5388, 2017 U.S. Dist. LEXIS 124433, at *31 n.5 (E.D.N.Y. Aug. 4, 2017), *report and recommendation adopted*, 2017 U.S. Dist. LEXIS 142103 (E.D.N.Y. Aug. 31, 2017).

The only named defendant—the Nassau County Sheriff's Department—is entitled to judgment as a matter of law on every claim because it is not a suable entity. (*See* ECF No. 71 at 5.) "Under New York law, departments that are merely administrative arms of a municipality do not have a legal identity separate and apart from the municipality and, therefore, cannot sue or be sued." *Davis v. Lynbrook Police Dep't*, 224 F. Supp. 2d 463, 477 (E.D.N.Y. 2002) (collecting cases). The defendant is an administrative arm of Nassau County without a legal identity separate from the County. *See Joseph v. Nassau Cnty. Corr. Ctr.*, No. 12-CV-4414, 2013 U.S. Dist. LEXIS 59118, at *9–10 (E.D.N.Y. Apr. 19, 2013) (collecting cases); *Campbell v. Sposato*, No. 15-CV-1958, 2015 U.S. Dist. LEXIS 170843, at *11 (E.D.N.Y. Nov. 17, 2015) (interpreting

the Nassau County Charter), *report and recommendation adopted*, 2015 U.S. Dist. LEXIS

169512 (E.D.N.Y. Dec. 16, 2015).  (*See also* ECF Nos. 66-7, 66-8 (Nassau County Charter).)

Accordingly, the defendant cannot be sued, and summary judgment on all claims is appropriate.

      Nevertheless, even if the defendant could be sued, or if the plaintiff had brought this

action against Nassau County, the Prison Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e,

bars this action because the plaintiff did not exhaust his administrative remedies.

## I.    Exhaustion of Administrative Remedies

      The PLRA provides that "[n]o action shall be brought with respect to prison conditions

under [Section 1983], or any other Federal law, by a prisoner confined in any jail, prison, or

other correctional facility until such administrative remedies as are available are exhausted."  42

U.S.C. § 1997e(a); *Senear v. Mininni*, No. 21-CV-11131, 2023 U.S. Dist. LEXIS 118242, at *5

(S.D.N.Y. July 10, 2023) ("[T]he PLRA establishes a mandatory exhaustion regime that

forecloses judicial discretion over an unexhausted claim." (citing *Ross v. Blake*, 578 U.S. 632,

641 (2016); *Amador v. Andrews*, 655 F.3d 89, 96 (2d Cir. 2011))).  This requirement "applies to

all inmate suits about prison life, whether they involve general circumstances or particular

episodes, and whether they allege excessive force or some other wrong."  *Angulo v. Nassau

Cnty.*, 89 F. Supp. 3d 541, 549 (E.D.N.Y. 2015) (quoting *Espinal v. Goord*, 558 F.3d 119, 124

(2d Cir. 2009)).

      "[P]roper exhaustion" occurs "only when an inmate appeals to the highest procedure

level possible and receives a final decision [on] their grievance."  *Senear*, 2023 U.S. Dist. LEXIS

118242, at *6 (citing *Woodford v. Ngo*, 548 U.S. 81, 93 (2006)); *see also Torres v. Carry*, 672 F.

Supp. 2d 338, 344 (S.D.N.Y. 2009) (declining to find exhaustion where the plaintiff had not

"fully exhausted" his administrative remedies because there was "no evidence that a final

decision" was "rendered" on his administrative appeal).  It also requires "compliance with an agency's deadlines and other critical procedural rules." *Angulo*, 89 F. Supp. 3d at 549 (quoting *Woodford*, 548 U.S. at 90–91).  A court must "look at the state prison procedures and the prisoner's grievance[s] to determine whether the prisoner has complied with those procedures." *Espinal*, 558 F.3d at 124 (citing *Jones v. Bock*, 549 U.S. 199, 218 (2007); *Woodford*, 548 U.S. at 88–90).

Exhaustion is an affirmative defense.  *Jones*, 549 U.S. at 216 ("We conclude that failure to exhaust is an affirmative defense under the PLRA, and that inmates are not required to specially plead or demonstrate exhaustion in their complaints."); *Angulo*, 89 F. Supp. 3d at 550. A defendant must establish, "by pointing to 'legally sufficient source[s]' such as statutes, regulations, or grievance procedures, that a grievance process exists and applies to the underlying dispute." *Hubbs v. Suffolk Cnty. Sheriff's Dep't*, 788 F.3d 54, 59 (2d Cir. 2015) (quoting *Mojias v. Johnson*, 351 F.3d 606, 610 (2d Cir. 2003)).  If the defendant satisfies this initial burden, "administrative remedies may nonetheless be deemed unavailable if the plaintiff can demonstrate that other factors—for example, threats from correctional officers—rendered a nominally available procedure unavailable as a matter of fact." *Id.* (citing *Hemphill v. New York*, 380 F.3d 680, 687–88 (2d Cir. 2004)).  "The threshold question of exhaustion under the PLRA is for the court to decide, even if there exist disputed issues of fact." *Edwards*, 2023 U.S. Dist. LEXIS 184090, at *12 (collecting cases).

The defendant has established that the NCCC had a grievance process and that the Inmate Handbook explained the procedure, deadlines, and appeals process.  (ECF No. 70 ¶¶ 100–05.) The plaintiff does not dispute that he received and was familiar with the NCCC Inmate Handbook and its grievance procedures.  *See Smith v. City of New York*, No. 12-CV-3303, 2013

U.S. Dist. LEXIS 144122, at *54 (S.D.N.Y. Sept. 26, 2013) (finding that inmates who receive an Inmate Handbook are "charged with familiarity with all steps of the grievance process, as outlined in [the] Handbook").  Indeed, the plaintiff used those procedures when he filed 16 grievances at NCCC, all of which NCCC staff answered.  (ECF No. 66-18 (NCCC's file of the plaintiff's grievances and staff's responses); ECF No. 68 ¶ 8 (NCCC's Grievance Coordinator attesting that the file is complete).)  None of his grievances had anything to do with his claims in this lawsuit.  (ECF No. 66-18; ECF No. 68 ¶¶ 9–10.)[12]  At his deposition, the plaintiff testified that he "wrote about the officers not having gloves or masks" when he had COVID-19 (ECF No. 66-4 at 34:20-23), but he could not have exhausted the administrative procedure for that grievance before he filed this action; he tested positive on January 29, 2021 (ECF No. 66-19), signed the complaint in this case on February 8, 2021 (ECF No. 1 at 5), and filed the complaint on February 11, 2021 (*id.* at 1).

The plaintiff testified that he complained to "Officer Mayweather," a grievance staff member, that officers were slamming gates while he slept; Officer Mayweather told him that "that is what [the officers] do, and that "[t]here are certain things that [inmates] try to complain about and it just doesn't . . . matter where you are" because it happens at "every facility."  (ECF No. 66-4 at 20:23–21:7, 34:24–35:5.)  This conversation does not satisfy the exhaustion requirement.  "[I]t is 'well settled that complaints and communications made outside of formal grievance procedures do not satisfy the PLRA's exhaustion requirement' and informal complaints to prison officers or staff will not suffice."  *Anderson v. Spizziota*, No. 11-CV-5663, 2016 U.S. Dist. LEXIS 18600, at *27 (E.D.N.Y. Feb. 12, 2016) (quoting *Smith*, 2013 U.S. Dist.

---

[12] The plaintiff testified that he did not file grievances about the mold on the ceiling (ECF No. 66-4 at 16:12-15), officers slamming gates (*id.* at 20:23-25), or his trouble sleeping (*id.* at 36:10-16).

LEXIS 144122, at *37), *report and recommendation adopted*, 2016 U.S. Dist. LEXIS 44821

(E.D.N.Y. Mar. 31, 2016).

Accordingly, the defendant has shown that the plaintiff did not exhaust his administrative

remedies.

**II.   Unavailability of Administrative Remedies**

Once a court determines that an inmate has not exhausted his administrative remedies, "it

must discern whether any of these remedies were 'unavailable'—if so, the failure to exhaust is

excused." *Edwards*, 2023 U.S. Dist. LEXIS 184090, at *20.  An administrative remedy is

considered unavailable "when (1) it functions as a 'dead end' because officers are unable or

consistently refuse to provide relief to inmates, (2) it is so opaque as to be unusable because

despite its existence 'no ordinary prisoner can discern or navigate it,' or (3) 'when prison

administrators thwart inmates' from utilizing remedies through 'machination, misrepresentation,

or intimidation.'" *Id.* at *20–21 (quoting *Ross*, 578 U.S. at 633).

The record does not show that NCSD or NCCC officers were unable or consistently

refused to provide relief for inmates' grievances.  The NCCC appears to have responded to all

the plaintiff's grievances; to the extent officers did not provide relief on a particular grievance,

the plaintiff does not show that the administrative process "precludes the 'possibility of some

relief' or that 'no such potential exists.'" *Senear*, 2023 U.S. Dist. LEXIS 118242, at *12

(quoting *Ross*, 578 U.S. at 643).[13]  Nor can NCCC's grievance procedure be "characterized as so

---

[13] Officer Mayweather's comments that filing a grievance about officers slamming gates was futile could
be interpreted as discouraging the plaintiff from filing the grievance, but there is no evidence that
Officer Mayweather kept the plaintiff from using the grievance process.  Telling an inmate that he
should not file a grievance because it would not be successful is "not the same as telling [him] that his
issue *could not* be addressed through the grievance process . . . It is only when a prison official tells an
inmate that he cannot pursue his grievance through the administrative procedure" that remedies may be
considered unavailable.  *Smith*, 2013 U.S. Dist. LEXIS 144122, at *55.

opaque or unusable that no ordinary prisoner could discern or navigate it" because the plaintiff

had already "navigated and utilized it to file a grievance" multiple times.  *Edwards*, 2023 U.S.

Dist. LEXIS 184090, at *22.  Finally, there is no evidence showing "machination,

misrepresentation, or intimidation" by officers to keep the plaintiff from filing grievances—nor

does the plaintiff make this argument.  On the contrary, the plaintiff filed 16 grievances on other

issues, which demonstrates that officers did not work to keep inmates from filing grievances.

      In short, the NCCC's administrative remedies were available to the plaintiff, and he did

not exhaust them for the claims he makes in this action.  Thus, the defendant is entitled to

judgment as a matter of law.

## III.    Other Grounds for Judgment as a Matter of Law

      Because the Court finds that the plaintiff's claims are barred in their entirety by the

PLRA's administrative exhaustion requirement, it is not necessary to address the defendant's

other arguments for summary judgment.  Nevertheless, the Court addresses whether the

complaint shows that the plaintiff's constitutional rights were violated and concludes that it does

not.  (*See* ECF No. 71 at 11–23.)

      The plaintiff has not shown that the challenged conditions are sufficiently serious that he

was "denied the minimal civilized measure of life's necessities."  *Darnell v. Pineiro*, 849 F.3d

17, 29–30 (2d Cir. 2017) (quoting *Walker v. Schult*, 717 F.3d 119, 125 (2d Cir. 2013)).[14]  *See,*

---

[14] Courts analyze conditions-of-confinement claims brought by pretrial detainees under the Due Process
Clause of the Fourteenth Amendment, and claims brought by "convicted prisoners" under the Eighth
Amendment.  *Darnell v. Pineiro*, 849 F.3d 17, 29 (2d Cir. 2017); *Walker v. Schult*, 717 F.3d 119, 125
(2d Cir. 2013).  Both claims have the same "objective prong," which requires a plaintiff to show that
the challenged conditions posed a "substantial risk" of harm "sufficiently serious that he was denied
the minimal civilized measure of life's necessities."  *Darnell*, 849 F.3d at 29 (quoting *Walker*, 717 F.3d
at 125).  The "subjective prong" for a Fourteenth Amendment claim requires a plaintiff to show that
"the defendant-official acted intentionally to impose the alleged condition, or recklessly failed to act
with reasonable care to mitigate the risk that the condition posed to the pretrial detainee even though
the defendant-official knew, or should have known, that the condition posed an excessive risk to health

*e.g.*, *Chunn v. Edge*, 465 F. Supp. 3d 168, 200 (E.D.N.Y. 2020) ("[A] court must 'assess whether society considers the risk that the prisoner complains of to be so grave that it violates contemporary standards of decency to expose *anyone* unwillingly to such a risk.'" (quoting *Helling v. McKinney*, 509 U.S. 25, 36 (1993))).

Even if the conditions were sufficiently serious, the plaintiff has not shown that NCSD officials were deliberately indifferent to those conditions.  To the contrary, the plaintiff acknowledges that prison staff treated his asthma (ECF No. 66-4 at 8:16–9:3; *see also* ECF No. 66-14; ECF No. 66-16) and spoke to him about his mental health (ECF No. 66-4 at 21:15–23:19).  Nor does he dispute that NHCC staff responded to his Sick Call requests (ECF No. 66-15) and treated him when he had COVID-19 (ECF No. 70 ¶¶ 80–81, 84–85), or that NCSD implemented COVID-19 protocols that complied with local, state and federal recommendations (ECF No. 70 ¶¶ 63–64).  *Cf. Chunn*, 465 F. Supp. 3d at 200 ("whether a particular danger poses a substantial risk of serious harm in a prison must be evaluated in light of the steps that the facility has already taken to mitigate the danger"); *Brown v. City of New York*, No. 21-CV-4632, 2023 U.S. Dist. LEXIS 16411, at *31 (S.D.N.Y. Jan. 30, 2023) ("Even assuming [the City's] response to COVID-19 was imperfect, or negligent, it is not enough to support a finding of deliberate indifference." (quoting *Jones v. Westchester Cnty.*, No. 20-CV-8542, 2022 U.S. Dist. LEXIS 81028, at *9 (S.D.N.Y. May 4, 2022))).  The plaintiff also does not establish that the defendant was aware of an "excessive risk to inmate health or safety" caused by mold, inadequate air ventilation, or gate slamming.  *Darnell*, 849 F.3d at 32, 35.

---

or safety."  *Id.* at 35.  For an Eighth Amendment claim, the defendant-official must have "acted or failed to act 'while actually aware of a substantial risk that serious inmate harm will result.'"  *Horace v. Gibbs*, 802 F. App'x 11, 14 (2d Cir. 2020) (quoting *Salahuddin v. Goord*, 467 F.3d 263, 279 (2d Cir. 2006)).  The plaintiff's claim does not satisfy either standard.

Nor does the plaintiff state a claim against Nassau County, as he does not allege or establish "an official policy or custom that . . . cause[d] [him] to be subjected to . . . a denial of a constitutional right." *Wray v. City of New York*, 490 F.3d 189, 195 (2d Cir. 2007) (quoting *Batista v. Rodriguez*, 702 F.2d 393, 397 (2d Cir. 1983)); *see also Escobar v. City of New York*, 766 F. Supp. 2d 415, 420 (E.D.N.Y. 2011) (municipal liability under Section 1983 "requires more than isolated incidents") (collecting cases); *Newton v. City of New York*, 566 F. Supp. 2d 256, 271 (S.D.N.Y. 2008) ("[A] custom or policy cannot be shown by pointing to a single instance of unconstitutional conduct by a mere employee of the [government].").

Finally, the plaintiff has not established that he is entitled to compensatory or punitive damages. He does not claim to have suffered more than a *de minimis* physical injury; he testified that the mold "bothered [him]" "[a]s time went by," but "not as much" (ECF No. 66-4 at 10:21–11:4), and that he has not "experienced any lasting health effects since being released from the [NCCC]" (*id.* at 33:5-8). *Jones v. H.H.C. Inc.*, No. 00-CV-6512, 2003 U.S. Dist. LEXIS 6510, at *14 (S.D.N.Y. Apr. 8, 2003) ("[A]n inmate seeking to recover anything other than nominal damages" in a federal action must "establish that he has suffered a 'physical injury.'" (quoting 42 U.S.C. § 1997e(e))); *Petty v. Goord*, No. 00-CV-803, 2008 U.S. Dist. LEXIS 38975, at *17 (S.D.N.Y. Apr. 22, 2008) ("Courts have strictly construed this requirement, barring claims by prisoners who demonstrate solely emotional or mental injury and barring physical injury claims where the injury alleged is de minimis." (citation omitted)), *report and recommendation adopted*, 2008 U.S. Dist. LEXIS 48692 (S.D.N.Y. June 25, 2008). The plaintiff has not claimed or shown that the defendant acted with "evil motive or intent" or showed "reckless or callous

indifference" to him; therefore, punitive damages are not available. *Lee v. Edwards*, 101 F.3d 805, 808 (2d Cir. 1996).[15]

## CONCLUSION

For these reasons, the defendant's motion for summary judgment is granted.

**SO ORDERED.**

s/Ann M. Donnelly

_____

ANN M. DONNELLY
United States District Judge

Dated: Brooklyn, New York
         March 12, 2024

---

[15] Moreover, punitive damages are not available in Section 1983 actions against municipalities. *DiSorbo v. Hoy*, 343 F.3d 172, 182 (2d Cir. 2003); *Ciraolo v. City of New York*, 216 F.3d 236, 238 (2d Cir. 2000).